# United States Court of Appeals for the Federal Circuit

---

**MERIDIAN PRODUCTS, LLC,**
*Plaintiff-Appellee*

v.

**UNITED STATES,**
*Defendant-Appellant*

---

2016-1730

---

Appeal from the United States Court of International Trade in No. 1:13-cv-00018-RKM, Senior Judge R. Kenton Musgrave.

---

Decided: March 28, 2017

---

ALEXANDER SCHAEFER, Crowell & Moring, LLP, Washington, DC, argued for plaintiff-appellee. Also represented by DANIEL CANNISTRA; FRANCES PIERSON HADFIELD, New York, NY.

TARA K. HOGAN, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by BENJAMIN C. MIZER, JEANNE E. DAVIDSON, REGINALD T. BLADES, JR.; JESSICA M. LINK, Office of Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

―――――――――――――

Before PROST, *Chief Judge*, NEWMAN and WALLACH,
*Circuit Judges*.

WALLACH, *Circuit Judge*.

In 2012, Appellee Meridian Products, LLC ("Meridian") asked the U.S. Department of Commerce ("Commerce") to issue a scope ruling that certain aluminum trim kit packages ("trim kits") do not fall within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China ("the Orders"). Commerce found the trim kits subject to the Orders' scope, and Meridian challenged that ruling before the U.S. Court of International Trade ("the CIT"). Five opinions and three remands later, the CIT sustained Commerce's third remand determination, in which Commerce found, under protest, that the trim kits do not fall within the Orders' scope. *See Meridian Prods., LLC v. United States* (*Meridian V*), 145 F. Supp. 3d 1329, 1331 (Ct. Int'l Trade 2016).

Appellant United States ("Government") appeals. We possess subject matter jurisdiction pursuant to 28 U.S.C. § 1295(a)(5) (2012). We reverse.

BACKGROUND

The instant appeal addresses whether particular products fall within the scope of existing antidumping and countervailing duty orders. As a result, we examine the Orders' scope, the description of the products in question, and the procedural history before turning to the merits.

I. The Subject Orders

Commerce generally investigates whether a foreign government or public entity provided "a countervailable subsidy with respect to the manufacture, production, or export" of merchandise that has entered the United

States, 19 U.S.C. § 1671(a)(1) (2012), and whether particular merchandise was sold in the United States "at less than its fair value,"[1] *id.* § 1673(1). At the conclusion of an investigation, if Commerce and the U.S. International Trade Commission ("the ITC") make the requisite findings,[2] Commerce publishes an order imposing duties on imported merchandise covered by the investigation. *Id.* §§ 1671e(a), 1673e(a). In each order, Commerce must "include[] a description of the subject merchandise[] in such detail as [it] . . . deems necessary."[3] *Id.* §§ 1671e(a)(2), 1673e(a)(2).

---

[1]     Congress has instructed Commerce to make these determinations using separate statutory formulas. A subsidy is countervailable if it provides a form of a "financial contribution" to a person, confers a "benefit" on that person, and is "specific." 19 U.S.C. § 1677(5), (5A). A foreign exporter sells merchandise at less than its fair value (i.e., dumps) when the merchandise's "normal value" (i.e., the merchandise's price in the home market) "exceeds the [merchandise's] export price or constructed export price" (i.e., the merchandise's price in the United States). *Id.* § 1677(35)(A).

[2]     The ITC determines whether the merchandise "materially injure[s]" a domestic industry, "threaten[s]" the industry with material injury, or "materially retard[s]" the industry's "establishment." 19 U.S.C. §§ 1671(a), 1673(a).

[3]     The discretion that Congress afforded to Commerce to describe the subject merchandise comports with the principle that "remedial legislation," like the trade remedy laws, "should . . . be given a liberal interpretation" and "exemptions from its sweep should be narrowed and limited to effect the remedy intended." *Piedmont & N. Ry. Co. v. Interstate Commerce Comm'n*, 286 U.S. 299, 311, 311−12 (1932); *see, e.g., Guangdong Wireking*

In 2011, Commerce published the Orders. *See Aluminum Extrusions from the People's Republic of China* (*Antidumping Duty Order*), 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions from the People's Republic of China* (*Countervailing Duty Order*), 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011).[4] The scope of the Orders describes the subject merchandise as "aluminum extrusions" that "are shapes and forms, produced by an extrusion process, made from" specified aluminum alloys. *Antidumping Duty Order*, 76 Fed. Reg. at 30,650. The subject extrusions possess "a wide variety of shapes and forms" in "a variety of finishes." *Id.* The subject extrusions also "may be described at the time of importation as parts for final finished products that are assembled after importation" and "may be identified with reference to their end use." *Id.* at 30,650, 30,651.

The Orders' scope contains several exclusions. In relevant part, the scope

> excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is

---

*Housewares & Hardware Co. v. United States*, 745 F.3d 1194, 1205–06 (Fed. Cir. 2014) (discussing the "remedial nature" of the antidumping and countervailing duty laws).

[4]    The Orders recite the same scope. *Compare Antidumping Duty Order*, 76 Fed. Reg. at 30,650–51, *with Countervailing Duty Order*, 76 Fed. Reg. at 30,653–54. We refer only to the scope in the *Antidumping Duty Order* for ease of reference.

assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the [Orders] merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

*Id.* at 30,651. The instant appeal concerns whether Meridian's trim kits meet the terms of the "finished goods kit" exclusion.

## II. Meridian's Trim Kits

"[B]ecause the descriptions of subject merchandise" in an order's scope pertain to a class or kind of goods and therefore "must be written in general terms," questions arise as to whether a particular product falls within the scope of an existing order. 19 C.F.R. § 351.225(a) (2012); *see* 19 U.S.C. § 1677(25) (defining "subject merchandise" as "the class or kind of merchandise that is within the scope of an . . . order"). Congress has authorized Commerce to issue scope rulings clarifying "whether a particular type of merchandise is within the class or kind of merchandise described in an existing . . . order." 19 U.S.C. § 1516a(a)(2)(B)(vi); *accord Royal Bus. Machs., Inc. v. United States*, 669 F.2d 692, 699 (CCPA 1982) (confirming Commerce's authority to issue scope rulings). An interested party may submit an application to Commerce to obtain clarification about an order's scope.[5] 19 C.F.R. § 351.225(c); *see Smith Corona Corp. v. United States*, 915 F.2d 683, 685–86 (Fed. Cir. 1990) (explaining that scope rulings clarify the terms of the original order but do not modify or amend them).

Meridian, the importer of the trim kits, asked Commerce to issue a scope ruling that "confirm[s]" the kits do

---

[5]    An "interested party" includes, inter alia, "an importer[] of subject merchandise." 19 U.S.C. § 1677(9)(A).

not fall within the Orders' scope. J.A. 200. Meridian described the trim kits as "an aesthetic frame around the perimeter of (though not attached to) a major home kitchen appliance," such as a "freezer" or "refrigerator." J.A. 200, 201. According to Meridian, the "[t]rim kits are sold as a package of finished parts" and "consist[] of extruded aluminum forms[] made from aluminum alloy" covered by the Orders' scope. J.A. 201. Meridian further stated that "[t]he trim kits also include a customer installation kit for the consumer to use during the final assembly in the residential kitchen," with the installation kit consisting of "a hexagonal wrench," "fasteners," "[a] set of instructions," and "hinge covers." J.A. 201, 203.

### III. Procedural History

In its initial scope ruling, Commerce found the trim kits subject to the Orders. J.A. 186–88. Commerce found that the trim kits "are aluminum extrusions which are shapes and forms[] made of an aluminum alloy that is covered by the scope of the Orders." J.A. 187 (internal quotation marks omitted). Commerce also rejected Meridian's contention that the trim kits meet the finished goods kit exclusion. J.A. 187–88. Assessing the trim kits against the Orders' scope and prior scope rulings, Commerce found that the trim kits did not meet the terms of the finished goods kit exclusion because, as the exclusion states, a kit's inclusion of "fasteners" and other extraneous materials does not remove it from the Orders' scope. J.A. 187–88.

Meridian appealed to the CIT, which then remanded Commerce's initial scope ruling. *Meridian Prods., LLC v. United States* (*Meridian I*), No. 1:13-cv-00018-RKM, 2013 WL 2996233, at *1 (Ct. Int'l Trade June 17, 2013). Observing that "a remand is sometimes needed if an intervening event may affect the validity of the agency action," the CIT agreed with Meridian's argument that Commerce

failed to consider a prior scope ruling interpreting terms of the Orders not at issue in the instant appeal. *Id.*

Subsequent litigation resulted in four more CIT opinions that included two additional remands to Commerce. *See Meridian Prods., LLC v. United States* (*Meridian II*), 971 F. Supp. 2d 1259, 1271 (Ct. Int'l Trade 2014) (remanding Commerce's first remand determination that the trim kits are within the scope of the Orders); *Meridian Prods., LLC v. United States* (*Meridian III*), 37 F. Supp. 3d 1342, 1354 (Ct. Int'l Trade 2014) (sustaining Commerce's second remand determination that the trim kits are within the scope of the Orders); *Meridian Prods., LLC v. United States* (*Meridian IV*), 77 F. Supp. 3d 1307, 1318–19 (Ct. Int'l Trade 2015) (granting motion for reconsideration of *Meridian III* and remanding Commerce's second remand determination for reconsideration). In the third remand determination, Commerce concluded that it must "find that the trim kits . . . are excluded from the Orders as finished goods kits" to comport with the CIT's interpretation of the Orders' scope. J.A. 25. In so doing, Commerce observed that "it appears that the [CIT]'s instructions resulted in a tension between the [CIT]'s holding and the plain language of the scope of the Orders." J.A. 25. The CIT sustained Commerce's third remand determination in its final opinion. *See Meridian V*, 145 F. Supp. 3d at 1330–31. This appeal followed.

DISCUSSION

I. Standard of Review

We apply the same standard of review as the CIT when reviewing a Commerce scope ruling, *see Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015), though we "give due respect to the [CIT's] informed opinion," *Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002) (internal quotation marks and citation omitted). Under that standard, we uphold a Commerce scope ruling that is

supported "by substantial evidence on the record" and otherwise "in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001) (internal quotation marks and citation omitted).

## II. The Trim Kits Fall Within the Unambiguous Terms of the Orders' Scope

This appeal hinges on the interpretation of the Orders' scope. The Government alleges that "the plain language of the Orders demonstrates that [the] . . . trim kits are within the scope of the Orders." Appellant's Br. 16 (capitalization modified). The Government further contends that, "even assuming the scope language of the Orders were ambiguous, the [CIT] failed to defer to Commerce's reasonable interpretation of the scope language." *Id.* at 24 (capitalization modified). After discussing the applicable legal framework, we address these arguments in turn.

### A. Legal Framework

"[N]o specific statutory provision govern[s] the interpretation of the scope of antidumping or countervailing orders." *Shenyang*, 776 F.3d at 1354. Commerce has filled the statutory gap with a regulation that sets forth a two-step test for answering scope questions, 19 C.F.R. § 351.225(k), and our case law has added another layer to the inquiry. First, Commerce must look to the text of an order's scope; second, Commerce will consult descriptions of the merchandise in other sources; and third, if still necessary, Commerce may consider additional factors comparing the merchandise in question to merchandise subject to the order.

Commerce's inquiry must begin with the order's scope to determine whether it contains an ambiguity and, thus,

is susceptible to interpretation.[6]  *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (explaining that the inquiry begins with "the language of the final order" and turns to other sources only if the scope itself "is ambiguous"); *ArcelorMittal*, 694 F.3d at 87 (similar); *see also Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 (Fed. Cir. 2002) (explaining that the scope is the "cornerstone" of the analysis and "a predicate for the interpretive process").  If the scope is unambiguous,[7] it governs.  *See, e.g.*, *ArcelorMittal*, 694 F.3d at 87 ("If [the scope] is not ambiguous, the plain meaning of the language governs."); *accord Walgreen Co. v. United States*, 620 F.3d 1350, 1357 (Fed. Cir. 2010) (similar).  "[B]ecause the meaning and scope of . . . orders are issues particularly within [Commerce's] expertise and special competence," we grant Commerce "substantial deference" with regard to its interpretation of its own antidumping duty and countervailing duty orders. *King Supply Co. v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) (internal quotation marks and citations omitted).

Nevertheless, the question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo. *See, e.g.*, *Allegheny Bradford Corp. v. United States*,

---

[6]    Although a "low threshold" exists for Commerce to find ambiguity, *Novosteel*, 284 F.3d at 1272, Commerce must not "identify an ambiguity where none exists," *ArcelorMittal Stainless Belg. N.V. v. United States*, 694 F.3d 82, 89 (Fed. Cir. 2012) (internal quotation marks and citation omitted).

[7]    The relevant scope terms are "unambiguous" if they have "a single clearly defined or stated meaning." *Unambiguous*, Webster's Third New International Dictionary of the English Language Unabridged (1986).

342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004) ("[A] scope determination is not in accordance with the law if it changes the scope of an order or interprets an order in a manner contrary to the order's terms." (citing *Duferco*, 296 F.3d at 1094–95)); *accord Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 146 F. Supp. 3d 1331, 1344 (Ct. Int'l Trade 2016) (same); *Walgreen Co. v. United States*, 33 Ct. Int'l Trade 1620, 1623 (2009) (similar), *aff'd*, 620 F.3d 1350.   The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence.   *See, e.g.*, *Novosteel*, 284 F.3d at 1269.

"Scope orders are interpreted with the aid of" other sources as described by regulation.  *Duferco*, 296 F.3d at 1097 (internal quotation marks and citation omitted). Specifically, Commerce "will" consult "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and [prior] determinations of [Commerce] (including prior scope determinations) and the [ITC]."  19 C.F.R. § 351.225(k)(1).  Although a party's description of merchandise in these sources may aid Commerce in making its determination, that description "cannot substitute for language in the order itself" because "[i]t is the responsibility of [Commerce], not those who [participated in] the proceedings, to determine the scope of the final orders."   *Duferco*, 296 F.3d at 1097 (footnote omitted). Commerce's analysis of these sources against the product in question produces factual findings reviewed for substantial evidence.  *See, e.g.*, *Fedmet Res. Corp. v. United States*, 755 F.3d 912, 919–22 (Fed. Cir. 2014) (reviewing Commerce's analysis under § 351.225(k)(1) for substantial evidence).

If the descriptions in the § 351.225(k)(1) sources "are not dispositive,"[8] Commerce will consider the following factors: "(i) [t]he physical characteristics of the product; (ii) [t]he expectations of the ultimate purchasers; (iii) [t]he ultimate use of the product; (iv) [t]he channels of trade in which the product is sold; and (v) [t]he manner in which the product is advertised and displayed." 19 C.F.R. § 351.225(k)(2). "In conducting this analysis, it is well settled that Commerce has discretion in how to balance" these factors. *Novosteel SA v. United States*, 128 F. Supp. 2d 720, 732 (Ct. Int'l Trade 2001) (internal quotation marks and citations omitted), *aff'd*, 284 F.3d 1261. Commerce's analysis of these factors against the product in question yields factual findings reviewed for substantial evidence. *See, e.g.*, *Crawfish Processors All. v. United States*, 483 F.3d 1358, 1363–64 (Fed. Cir. 2007) (reviewing Commerce's analysis under § 351.225(k)(2) for substantial evidence).

## B. The CIT's Interpretation Conflicts with Precedent and the Orders' Unambiguous Terms

According to Commerce, the CIT erred in its interpretation of the Orders' scope because "a reasonable reading of the [O]rders as a whole" demonstrates that "an aluminum extrusion product and fasteners, without more, will not qualify for the finished goods kit exclusion." Appellant's Br. 14. The CIT disagreed. *See, e.g.*, *Meridian IV,* 77 F. Supp. 3d at 1318−19. We agree with Commerce.

We must first assess whether the plain language of the Orders' scope, in light of the disputed 19 C.F.R. § 351.225(k)(1) sources, is unambiguous. The relevant

---

8    The term "dispositive" means that the descriptions in the § 351.225(k)(1) sources "definitively answer the scope question." *Sango Int'l, L.P. v. United States*, 484 F.3d 1371, 1379 (Fed. Cir. 2007).

exclusion to the Orders excludes finished goods kits, which it defines as "packaged combination[s] of parts that contain[], at the time of importation, all of the necessary parts to fully assemble a final finished good and require[] no further finishing or fabrication, such as cutting or punching, and [are] assembled 'as is' into a finished product." *Antidumping Duty Order*, 76 Fed. Reg. at 30,651. Commerce contends that this exclusion contains an exception, which explains that "[a]n imported product will not be considered a 'finished goods kit'" and therefore excluded from the scope of the Orders "merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." Appellant's Br. 17 (quoting *Antidumping Duty Order*, 76 Fed. Reg. at 30,651). In Commerce's view, products that "meet the preliminary requirements for the finished goods kit exclusion[] may nonetheless be subject to the [O]rders" if a kit contains only aluminum extrusions and fasteners. *Id.*

Reading the terms of the Orders' scope, the CIT disagreed with Commerce's interpretation. The CIT instead found that "[c]ontext renders unreasonable Commerce's reading of the exclusionary language of the scope." *Meridian IV*, 77 F. Supp. 3d at 1316. The CIT reasoned that, because the products satisfy the definition of a "finished goods kit," "[t]he inclusion of 'fasteners' or 'extraneous materials' is not determinative when qualifying a kit consisting of multiple parts which otherwise meets the exclusionary requirements." *Id.* The CIT added that "there is nothing in the language [of the exclusion] that indicates that the parts in an otherwise qualifying kit cannot consist entirely of aluminum extrusions." *Id.* Thus, the CIT determined that a kit covered by the exclusion should not be removed from the exclusion because it includes fasteners considered to be "parts necessary for forming a complete finished good." *Id.* at 1317.

The CIT's interpretation of the Orders' scope suffers from three flaws. First, in the CIT's view, the inquiry ends if a disputed product meets the definition of a "finished goods kit," thereby resulting in the disputed product's exclusion from the Orders. That interpretation fails to consider all of the terms of the exclusion (i.e., the statement that a product will not be considered a finished goods kits "merely by including fasteners") and improperly elevates certain aspects of the exclusion over others by ignoring the qualifying language that Commerce describes as an exception. *See, e.g.*, *King Supply*, 674 F.3d at 1350 (interpreting a scope so that it is "informative and non-superfluous"); *Eckstrom*, 254 F.3d at 1073 (rejecting a construction that rendered scope terms "mere surplusage"). Where (as here) multiple sentences comprise an order's scope and "there is no indication that one sentence helps to define the scope while the other does not," we will not read out a sentence intended by Commerce to be given effect. *Allegheny*, 342 F. Supp. 2d at 1190. Second, the CIT would exclude a kit even if it consists entirely of unassembled aluminum extrusions and fasteners. That interpretation would render the Orders' scope, which by its terms covers aluminum extrusions, meaningless. *See, e.g.*, *Duferco*, 296 F.3d at 1095 (stating that "Commerce cannot interpret an . . . order so as to change the scope of that order" (internal quotation marks and citation omitted)). Third, the CIT's interpretation would "render[] the [O]rders internally inconsistent" because it would allow for kits containing only unassembled aluminum extrusions and fasteners to be excluded from the scope of the Orders, whereas aluminum extrusions imported individually or as parts would be explicitly included in the scope. *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1371 (Fed. Cir. 1998); *see King Supply*, 674 F.3d at 1349 (stating that "requisite clear exclusionary language must leave no reasonable doubt that certain products were intended to be outside the scope of the . . . order").

Commerce did not err in its interpretation of the finished goods kit exclusion in the initial scope ruling. *See* J.A. 178–89. The exclusion states that, to fall outside the scope of the Orders, a finished goods kit must contain more than only aluminum extrusion parts necessary for final assembly. *See Antidumping Duty Order*, 76 Fed. Reg. at 30,651 (describing the finished goods as those "*containing* aluminum extrusions" and packaged in a kit with a "combination of *parts*" (emphases added)). The exclusion does not limit the kits to aluminum extrusions and, instead, suggests the inclusion of non-aluminum *parts* in the kit with other materials. *See id.* Qualifying language further narrows the exclusion by reinforcing that the "mere[]" addition of fasteners will not bring a kit with only aluminum extrusions outside the scope of the Orders. *Id.* Finally, the exclusion states that the component parts of the kit relevant to the analysis are those parts in a "packaged combination of parts" that are "necessary . . . to fully assemble a final finished good," regardless of additional materials that may be included in a kit's packaging, but which are not otherwise included in the final assembled product. *Id.*

Commerce's determination is further supported by "prior scope rulings interpreting the *same* antidumping order[, which] are particularly relevant under [19 C.F.R. §] 351.225(k)(1)." *Mid Continent*, 725 F.3d at 1304 n.4 (citation omitted). Commerce, in its interpretation of the Orders' scope, looked to prior rulings that found a kit with aluminum components and extraneous materials could not be excluded from the Orders' scope using the same interpretation of the exclusion's terms argued here. *See* J.A. 187–88 & n.32 (discussing, inter alia, J.A. 249–64). Thus, in light of its terms and Commerce's prior scope rulings, the exclusion's terms are unambiguous and, therefore, control the inquiry. *See ArcelorMittal*, 694 F.3d at 87.

Although not necessary to our analysis, other aspects of the Orders' scope confirm the relevant exclusion's unambiguous nature. For example, products "containing aluminum extrusions as parts" and "non-aluminum extrusion components" belonging to kits are generally excluded from the scope of the Orders. *Antidumping Duty Order*, 76 Fed. Reg. at 30,651. By contrast, products that contain only aluminum extrusions are included in the Orders' scope. *See id.* (explaining that products containing aluminum extrusions and nothing more are within the scope, "regardless of whether they are ready for use at the time of importation"). The plain text of the other passages in the Orders thus contemplates a basic divide between products whose components relevant to the scope inquiry consist of non-aluminum extrusion parts, which *are* excluded from the scope of the Orders, and products whose components relevant to the scope inquiry contain only aluminum extrusion parts, which *are not* excluded.

C. Substantial Evidence Supports Commerce's Finding That the Orders' Scope Covers Meridian's Trim Kits

We must now examine whether Meridian's trim kits meet the unambiguous terms of the finished goods kit exclusion.[9] Commerce concedes that Meridian's trim kits "meet the preliminary requirements for the finished goods

---

[9]    Because Commerce asks us to sustain its initial scope ruling, Appellant's Br. 28, we assess whether substantial evidence supports Commerce's conclusion that the trim kits meet the Orders' scope's unambiguous terms, as Commerce concluded in the initial scope ruling, J.A. 187–88. We will not review Commerce's findings as to the definition of "fasteners" or "extraneous materials" because they were not briefed or contested on the record before Commerce issued the initial scope ruling. *See* J.A. 190−98 (Petitioner's Comments on Scope Request), 200−43 (Meridian Scope Ruling Request).

kit exclusion." Appellant's Br. 17. Thus, the only question that remains is whether the trim kits comprise an aluminum extrusion product that merely includes fasteners and other extraneous materials, such that the trim kits meet the exception to the finished goods kit exclusion.

Substantial evidence supports Commerce's finding that the trim kits meet the exception to the finished goods kit exclusion. Meridian explained that "[a] typical trim kit" includes the following items: trim, grilles, strips, brackets, screws, hinge covers, wrenches, and assembly instructions. J.A. 202; *see* J.A. 203. Meridian does not dispute that the trim, grilles, and strips are aluminum extrusions subject to the Orders. *See* Appellee's Br. 12. Commerce found the brackets and screws to be "fasteners" that "meet the definition of extraneous fasteners and packaging materials described in" the qualifying language of the exclusion, J.A. 188, a determination that the record supports, *see, e.g.*, J.A. 217 (where the assembly instructions demonstrate that the brackets and screws hold the aluminum extrusions in place). Commerce further found that the hinge covers, wrench, and assembly instructions are not relevant to the inquiry because they are "not assembled into or part of the assembled trim kit." J.A. 188; *see* J.A. 105. That rationale comports with the Orders' unambiguous scope. *See Antidumping Duty Order*, 76 Fed. Reg. at 30,651 (explaining that only parts comprising the final assembled product are considered for purposes of the finished goods kit exclusion). To conclude otherwise would introduce a condition not present in the Orders' scope and, therefore, conflict with precedent. *See, e.g.*, *Smith Corona*, 915 F.2d at 685−86 (explaining that scope rulings clarify the terms of the original order but do not modify or amend them).

## CONCLUSION

We have considered the parties' remaining arguments and find them unpersuasive. We (1) reverse the CIT's

decision in *Meridian V* affirming Commerce's third remand determination; (2) vacate the CIT's decisions in *Meridian I*, *Meridian II*, *Meridian III*, and *Meridian IV*; (3) instruct the CIT to vacate Commerce's first, second, and third remand determinations; and (4) order the CIT to reinstate Commerce's initial scope ruling. Accordingly, the decision of the U.S. Court of International Trade is

## REVERSED

### COSTS

Each party shall bear its own costs.