# United States Court of Appeals for the Federal Circuit

---

**WHIRLPOOL CORPORATION,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**
*Defendant-Appellant*

---

2017-1117

---

Appeal from the United States Court of International Trade in No. 1:14-cv-00199-TCS, Chief Judge Timothy C. Stanceu.

---

Decided: May 23, 2018

---

DONALD HARRISON, Gibson, Dunn & Crutcher LLP, Washington, DC, argued for plaintiff-appellee.

ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for defendant-appellant. Also represented by ALAN H. PRICE, TESSA V. CAPELOTO, DERICK HOLT.

---

Before PROST, *Chief Judge,* MOORE and REYNA,
*Circuit Judges.*

Opinion for the court filed by *Chief Judge* PROST.

Opinion concurring-in-part, dissenting-in-part filed by
*Circuit Judge* REYNA.

PROST, *Chief Judge*.

Aluminum Extrusions Fair Trade Committee ("AEFTC") appeals a decision from the U.S. Court of International Trade ("the CIT") affirming a scope ruling of the U.S. Department of Commerce. The scope ruling held that Whirlpool Corporation's kitchen appliance door handles with end caps ("assembled handles") do not fall within the scope of the antidumping and countervailing duty orders on aluminum extrusions from the People's Republic of China ("the Orders"). For the reasons stated below, we affirm-in-part, reverse-in-part, vacate-in-part, and remand.

## BACKGROUND

The instant appeal addresses whether particular products fall within the scope of existing antidumping and countervailing duty orders. We examine the Orders' scope and the procedural history before turning to the merits.

### I

Commerce published the Orders in 2011. *See Aluminum Extrusions from the People's Republic of China: Antidumping Duty Order*, 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions from the People's Republic of China: Countervailing Duty Order*, 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011). The scope of the Orders describes the subject merchandise as "aluminum extrusions" that "are shapes and forms, produced by an extrusion process, made from" specified aluminum alloys. *Antidumping Duty Order*, 76 Fed. Reg.

at 30,650.[1]  The subject extrusions "may be described at the time of importation as parts for final finished products that are assembled after importation." *Id.*  The scope also "includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise." *Id.*

The Orders' scope contains several exclusions. *Meridian*, 851 F.3d at 1379.  For example, the scope has a finished merchandise exclusion, which "excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *Antidumping Duty Order*, 76 Fed. Reg. at 30,651.  The scope also has a finished goods kit exclusion, which

> excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit."  A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product.

*Id.*  The next sentence of the Orders includes, however, an exception to the finished goods kit exclusion. *See Meridian*, 851 F.3d at 1385.  The exception states that "[a]n

---

[1]    The Orders recite the same scope. *See Meridian Prod., LLC v. United States*, 851 F.3d 1375, 1379 n.4 (Fed. Cir. 2017).  *Compare Antidumping Duty Order*, 76 Fed. Reg. at 30,650–51, *with Countervailing Duty Order*, 76 Fed. Reg. at 30,653–54.  We refer only to the scope in the Antidumping Duty Order for ease of reference.

imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." *Id.*

## II

On December 20, 2013, Whirlpool submitted a request for a scope ruling that its kitchen appliance door handles with end caps were not covered by the scope of the Orders. Whirlpool's December 2013 Scope Request was expressly based on a claim that its assembled handles were subject to the finished merchandise exclusion.

On August 4, 2014, Commerce issued its Scope Ruling for Whirlpool's assembled handles.[2] Commerce found that "the handles at issue do not meet the exclusion criteria for 'finished merchandise' and, therefore, are inside the scope of the Orders." J.A. 340. As a threshold issue, Commerce rejected Whirlpool's argument that the fasteners exception language in the scope only applies in the context of the finished goods kit exclusion and that it should not apply in the finished merchandise exclusion. J.A. 342. Commerce found "unconvincing the notion that an unassembled product in kit-form that consists solely of extruded aluminum, save for fasteners, would . . . fall inside the scope while the identical product, entering the

---

[2] This August 2014 Scope Ruling also addressed a January 2014 Scope Request from Whirlpool. That request dealt with aluminum extruded appliance handles that consisted of a single aluminum extrusion *without* end caps or other components. The January 2014 Scope Request is not relevant to the instant appeal, as Whirlpool did not appeal the CIT decision that these handles were covered by the Orders.

United States as an assembled good, would fall outside the scope of the Orders." J.A. 43.

Because Commerce determined that the fasteners exception also applies to the finished merchandise exclusion, it concluded that "the mere inclusion of fasteners, in this case the plastic end caps, does not result in the extruded aluminum handles falling outside the scope of the Orders as extruded finished merchandise." J.A. 341. Citing the dictionary definition of a washer, Commerce found that "the end caps . . . are involved in attaching the handle to the refrigerator door in a manner that allows the handle to fit tightly to the refrigerator door and relieves friction between the door and the handle," and on that basis found "that the plastic end caps are analogous to a washer." J.A. 340. Commerce, in a prior scope ruling, had considered washers to fall within the scope's reference to fasteners. Accordingly, Commerce found "that the handles at issue are comprised entirely of extruded aluminum and fasteners (i.e., plastic end caps)." J.A. 340.

Whirlpool appealed Commerce's August 2014 Scope Ruling to the CIT. After briefing and oral argument, the CIT issued its February 2016 Remand Order (*Whirlpool I*). The CIT remanded to Commerce for two reasons. First, the CIT determined that the general scope language of the Orders could not be reasonably interpreted to include Whirlpool's assembled handles at all. The CIT noted that "Commerce did not rely on the 'subassemblies' provision in the general scope language," which was "understandable" based on evidence that "the assembled handles are imported in a form in which they require no further assembly or processing prior to the intended use." J.A. 45. Second, the CIT determined that, even if the assembled handles were described by the general scope language, Commerce erroneously determined that the assembled handles do not qualify for the finished merchandise exception because the fasteners exception does not apply to the finished merchandise exclusion. The CIT

also determined that Commerce employed flawed logic and ignored record evidence in concluding that the plastic end caps in the assembled handles are "washers" and therefore "fasteners."

With respect to the CIT's second basis for its remand order, it stated that Commerce's "presum[ption] that the exception for fasteners in the finished goods kit exclusion applies to the finished merchandise exclusion as well . . . is at odds with established principles of construction." J.A. 47–48. According to the CIT, if "Commerce . . . had intended to sweep into the scope any assembled good consisting solely of aluminum extrusion components and fasteners, [it would have] so provide[d] in the scope language. Instead, Commerce expressly confined its 'fasteners' exception to the finished goods kit exclusion." J.A. 48.

On remand, Commerce determined, "under respectful protest," that the assembled handles were "outside the scope of the Orders because, consistent with the [CIT]'s interpretation of the scope language, there is no general scope language which covers such products." J.A. 29. Commerce declined to provide any further analysis with respect to the finished merchandise exclusion, explaining that "the issue of whether Whirlpool's handles with end caps are subject to the exclusion for finished merchandise is rendered moot by the [CIT]'s findings and our resulting determination, under protest, that there is no general scope language which covers these products." J.A. 35.

In its August 2016 Opinion (*Whirlpool II*), the CIT affirmed Commerce's April 2016 Redetermination Decision. This appeal followed. We have subject matter jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

I

"We apply the same standard of review as the CIT when reviewing a Commerce scope ruling, though we give due respect to the CIT's informed opinion." *Meridian*, 851 F.3d at 1380 (internal quotation marks and citations omitted). "Under that standard, we uphold a Commerce scope ruling that is supported 'by substantial evidence on the record' and otherwise 'in accordance with law.'" *Id.* (quoting 19 U.S.C. § 1516a(b)(1)(B)(i)). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001) (internal quotation marks and citation omitted).

There is no specific statutory provision governing the interpretation of the scope of the Orders. *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015). But Commerce has filled this statutory gap with a regulation, 19 C.F.R. § 351.225(k), requiring Commerce to engage in a two-step process when determining the scope of an order. *Id.*; *Meridian*, 851 F.3d at 1381. First, under § 351.225(k)(1), Commerce must consider the scope language contained in the order, the descriptions contained in the petition, and how the scope was defined in the investigation and in the determinations issued by Commerce and the ITC. *Yuanda*, 776 F.3d at 1354. If Commerce concludes the product is, or is not, included within the scope of the order, Commerce issues a final scope ruling. *Id.* If a § 351.225(k)(1) analysis is not dispositive, however, then Commerce proceeds to an analysis of the Diversified

Products criteria under subsection (k)(2) of its regulation.[3]
*Id.*

Commerce's inquiry begins with the Orders' scope to
determine whether it contains an ambiguity and, thus, is
susceptible to interpretation. *Meridian*, 851 F.3d at 1381.
The question of whether the unambiguous terms of a
scope control the inquiry, or whether some ambiguity
exists, is a question of law that we review de novo. *Id.* at
1382. If the scope is unambiguous, the plain meaning of
the Orders' language governs. *Id.* at 1381. The question
of whether a product meets the unambiguous scope terms
then presents a question of fact reviewed for substantial
evidence. *Id.* at 1382.

Because the meaning and scope of the Orders are is-
sues particularly within Commerce's expertise and special
competence, we grant Commerce substantial deference
with regard to its interpretation of its own Orders. *Id.* at
1381–82. While Commerce "enjoys substantial freedom to
interpret and clarify its antidumping duty orders . . . , it
may not change them." *Ericsson GE Mobile Commc'ns,
Inc. v. United States*, 60 F.3d 778, 782 (Fed. Cir. 1995), *as
corrected on reh'g* (Sept. 1, 1995). Accordingly, a final
order may not be interpreted "in a way contrary to its
terms," *Smith Corona Corp. v. United States*, 915 F.2d
683, 686 (Fed. Cir. 1990), nor in a way "so as to change
the scope of that order," *Eckstrom Indus.*, 254 F.3d at
1072.

## II

This appeal hinges on the interpretation of the Or-
ders. Accordingly, we must determine whether Commerce

---

[3]    Here, Commerce found that its § 351.225(k)(1)
analysis was dispositive and that it was unnecessary to
consider the additional factors specified in § 351.225(k)(2).
J.A. 339.

properly interpreted the relevant portions of the Orders and, if so, whether Commerce's findings as to whether the product meets the scope terms are supported by substantial evidence. We begin our discussion with the Orders' general scope language followed by the express exclusions from that general scope.

## A

According to AEFTC, the CIT erred in its interpretation of the Orders' general scope language because it "ignores that the scope of the order was intended to cover all aluminum extrusions produced with aluminum alloys commencing with 1, 3, and 6 unless expressly excluded." Appellant Br. 27. AEFTC maintains that "the scope expressly includes aluminum extrusions, whether further fabricated or not, and even if incorporated into a subassembly, as well as aluminum extrusions which are identified by reference to their end use (such as kitchen appliance handles), as Commerce acknowledged in its scope ruling." *Id.* We agree.

In *Whirlpool I*, the CIT examined "whether the general scope language reasonably may be interpreted to include these handles even though the handles are assemblies containing an extrusion and various other parts and even though they are imported in a fully-assembled form, ready for use." J.A. 43. The CIT determined that "the term 'extrusion' is not defined in the general scope language so as to include a good simply because an extruded aluminum component is present within a good consisting of an assembly." J.A. 44. Accordingly, the CIT concluded that the general scope language is not reasonably interpreted to include the assembled handles because "[t]he handles at issue are not themselves 'extrusions' but rather are assemblies, each of which contains an extrusion, machined and surface-treated, as the principal component." J.A. 43. This conclusion is incorrect.

Although the CIT properly recognized that "the general scope language provides that [an aluminum extrusion] remains in the scope even though it has been subjected to one of three specified types of post-extrusion processes," the CIT erred when it stated that assembly processes were absent from the specified post-extrusion processes. J.A. 44. The general scope language unambiguously includes aluminum extrusions that are part of an assembly. The Orders explicitly include aluminum extrusions "that are assembled after importation" in addition to "aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies." *Antidumping Duty Order*, 76 Fed. Reg. at 30,650. Therefore, the interpretation relied on by the CIT in *Whirlpool I* was improper, and substantial evidence supports Commerce's finding in its August 2014 Scope Ruling that the general scope language includes Whirlpool's assembled handles.

B

We must next determine whether Commerce, in its August 2014 Scope Ruling, applied the proper interpretation of the exclusions to the Orders and, if so, whether substantial evidence supports its finding that the exclusions do not apply.

First, with respect to the finished goods kit exclusion we agree with the CIT that "[b]ecause Whirlpool's assembled door handles are not imported in disassembled form, the finished goods kit exclusion is inapplicable." J.A. 47. This exclusion is unambiguous and so the plain meaning of the language of the Orders governs. *Meridian*, 851 F.3d at 1381. The language of the Orders states that "[t]he scope also excludes finished goods containing aluminum extrusions *that are entered unassembled* in a 'finished goods kit.'" *Antidumping Duty Order*, 76 Fed. Reg. at 30,651 (emphasis added). "A finished goods kit is understood to mean a *packaged combination of parts* that contains, at the time of importation, all of the necessary

parts to fully assemble a final finished good and requires no further finishing or fabrication." *Id.* (emphasis added). Whirlpool's handles and end caps do not enter unassembled as a packaged combination of parts. They enter assembled. Accordingly, Whirlpool's assembled handles do not meet the unambiguous terms of the finished goods kit exclusion.

Second, with respect to the finished merchandise exclusion we also agree with the CIT. The Orders define finished merchandise as "merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels." *Antidumping Duty Order*, 76 Fed. Reg. at 30,651. The next two sentences describe a different exclusion to the Orders, which excludes finished goods kits, as described above. *Id.* Following those sentences, the Orders state "[a]n imported product will not be considered a 'finished goods kit' and therefore excluded from the scope of the investigation merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product." *Id.*

Commerce, in its August 2014 Scope Ruling, rejected Whirlpool's argument that this fasteners language only applies in the context of the finished goods kit exclusion and that it did not apply in the separate finished merchandise exclusion. J.A. 342–43. Commerce concluded, therefore, that "the mere inclusion of fasteners, in this case the plastic end caps, does not result in the extruded aluminum handles falling outside the scope of the Orders as extruded finished merchandise." J.A. 341.

According to the CIT in *Whirlpool I*, Commerce erred in its August 2014 Scope Ruling interpretation of the Orders' scope because Commerce's "presum[ption] that the exception for fasteners in the finished goods kit exclu-

sion applies to the finished merchandise exclusion as well . . . is at odds with established principles of construction." J.A. 47–48. We agree with the CIT.

As noted above, although Commerce "enjoys substantial freedom to interpret and clarify its antidumping duty orders . . . , it may not change them." *Ericsson*, 60 F.3d at 782. Commerce's interpretation of the fasteners exception and whether it applies to the finished merchandise exclusion is contrary to the terms of the Orders, and is therefore incorrect. *Smith*, 915 F.2d at 686.

We first assess whether the plain language of the exception for fasteners is unambiguous. *Meridian*, 851 F.3d at 1383. As we have noted, the question of whether some ambiguity exists, is a question of law that we review de novo. *Id.* at 1382. We conclude that the exception for fasteners unambiguously applies only to the finished goods kit exclusion and not to the finished merchandise exclusion for at least three reasons.

First, the single sentence that describes the fasteners exception specifically refers only to a finished goods kit and does not mention finished merchandise. *See Antidumping Duty Order*, 76 Fed. Reg. at 30,651. Second, this sentence describes how a product will not be considered a finished good kit "merely by including fasteners . . . *in the packaging*." *Id.* (emphasis added). This reference to "the packaging" refers back to the finished good kit exclusion where "[a] finished good kit is understood to mean *a packaged* combination of parts." *Id.* (emphasis added). There is no reference to packaging in the finished merchandise exclusion. Finally, finished merchandise is "fully and permanently assembled and completed at the time of entry," whereas finished goods kits enter unassembled as "a packaged combination of parts." *Id.* We find it reasonable that Commerce, in drafting the Orders, would have elected to treat assembled merchandise differently from goods entering unassembled in kit form.

We therefore agree with the CIT that if Commerce had actually intended to sweep into the scope all finished merchandise consisting solely of aluminum extrusion components and fasteners, it would have done so in the scope language rather than expressly confining its fasteners exception to the finished goods kit exclusion.

Because we conclude that the exception for fasteners is unambiguous, the plain meaning of its language governs. *Meridian*, 851 F.3d at 1381. Therefore, the fasteners exception only applies to the finished goods kit exclusion and it does not apply to the finished merchandise exclusion.

Having concluded that Commerce applied an incorrect interpretation of the fasteners exception language of the Orders, we need not determine whether substantial evidence supports its August 2014 Scope Ruling finding that Whirlpool's assembled handles do not meet the exclusion criteria for finished merchandise.[4]

Because, in Commerce's view, the fasteners exception applied to the finished merchandise exclusion, it did not reach a determination in its Scope Ruling as to whether Whirlpool's assembled handles actually meet the requirements for the finished merchandise exclusion in the first place. In its April 2016 Redetermination Decision,

---

[4] On appeal, the parties also dispute whether substantial evidence supports Commerce's determination in its August 2014 Scope Ruling that the plastic end caps contained in Whirlpool's door handles are fasteners. Because we conclude today that the fasteners exception does not apply to the finished merchandise exclusion, however, the question of whether these end caps fall within the scope language's reference to "fasteners" is not relevant to determining whether Whirlpool's assembled handles qualify for the finished merchandise exclusion.

Commerce also declined to address AEFTC's argument that Whirlpool's assembled handles should not fall under the finished merchandise exclusion because they are merely parts of a larger, final finished product (e.g., a refrigerator), and that it is only the larger, final finished product itself that is included under the finished merchandise exclusion. Commerce stated that the question of whether the assembled handles meet the requirements for the finished merchandise exclusion was rendered moot by the CIT's determination that there is no general scope language which covers these products.

Because Commerce did not reach this determination, the CIT also declined to engage in an analysis of the finished merchandise exclusion in *Whirlpool II*. Accordingly, we do not now, for the first time on appeal, determine whether Whirlpool's assembled handles meet the requirements for the finished merchandise exclusion, namely whether the assembled handles are "merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry." *Antidumping Duty Order*, 76 Fed. Reg. at 30,651. On remand, Commerce will be given an opportunity to arrive at a legally permissible interpretation of the finished merchandise exclusion and Whirlpool's assembled handles should be reassessed in light of that interpretation. *See Ericsson*, 60 F.3d at 783.

CONCLUSION

We conclude that substantial evidence supports Commerce's August 2014 Scope Ruling that the general scope language of the Orders describes Whirlpool's assembled handles. Accordingly, we reverse *Whirlpool II* affirming Commerce's April 2016 Redetermination Decision and instruct the CIT to vacate Commerce's April 2016 Redetermination Decision and reinstate the portion of Commerce's August 2014 Scope Ruling finding that the assembled handles fall within the general scope language.

We also vacate those portions of the CIT's *Whirlpool I* holding that the general scope language of the Orders did not describe Whirlpool's assembled handles.

With respect to the exclusions from the Order's scope, we conclude that the exception for fasteners unambiguously applies only to the finished goods kit exclusion and not to the finished merchandise exclusion. Further, because the finished goods kit exclusion is inapplicable to Whirlpool's assembled handles, so too is the fasteners exception to the finished goods kit exclusion. Accordingly, we affirm those portions of *Whirlpool I* that are consistent with these conclusions and instruct the CIT to vacate the remainder of Commerce's August 2014 Scope Ruling.[5]

Finally, the case is remanded to the CIT for further proceedings, in keeping with this opinion, to determine whether Whirlpool's assembled handles meet the requirements for the finished merchandise exclusion.

## AFFIRMED-IN-PART, REVERSED-IN-PART VACATED-IN-PART, AND REMANDED

### Costs

The parties shall bear their own costs.

---

[5] These decisions are only reversed or vacated as to those portions addressing Whirlpool's December 2013 Scope Request pertaining to the assembled handles with end caps. The January 2014 Scope Request, which dealt with aluminum extruded appliance handles that consisted of a single aluminum extrusion without end caps or other components, is not addressed by the instant appeal, as Whirlpool did not appeal the CIT decision that these handles were covered by the Orders.

# United States Court of Appeals for the Federal Circuit

—————————————

**WHIRLPOOL CORPORATION,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant*

**ALUMINUM EXTRUSIONS FAIR TRADE COMMITTEE,**
*Defendant-Appellant*

—————————————

2017-1117

—————————————

Appeal from the United States Court of International Trade in No. 1:14-cv-00199-TCS, Chief Judge Timothy C. Stanceu.

—————————————

REYNA, *Circuit Judge,* concurring-in-part, dissenting-in-part.

I concur with the majority that "the interpretation relied on by the CIT in *Whirlpool I* was improper, and substantial evidence supports Commerce's finding in its August 2014 Scope Ruling that the general scope language includes Whirlpool's assembled handles." Maj. Op. at 10.

The majority highlights a fundamental error in the CIT's holding that the "general scope language is not reasonably interpreted to include the assembled handles because '[t]he handles at issue are not themselves "extrusions" but rather are assemblies, each of which contains an extrusion, machined and surface-treated, as the principal component.'" *Id.* at 9. I agree with the majority that "[t]his conclusion is incorrect." *Id.*

The court's holding that the general scope language is reasonably interpreted to include the Whirlpool handles drives the remainder of the scope review because a scope inquiry first begins by asking whether the good in questions is covered under the general scope language of the duty order. The answer here is yes. The next question is whether a good covered by the general scope language is excluded under an exclusion provision. Here, it is undisputed that the handles are not excluded under the finished goods kit exclusion. The majority concludes that Commerce left unanswered the question whether the finished merchandise exclusion applies, and, on this basis, remands so that Commerce may address the applicability of the finished merchandise exclusion.

The record is clear, however, that Commerce has addressed the question of whether Whirlpool's handles are excluded under the finished merchandise exclusion.[1] In

---

[1] This appeal involves the CIT's judgment on Commerce's initial scope ruling determination and Commerce's remand scope ruling determination. We review the CIT's decisions *de novo* applying to Commerce's determination the same standard of substantial evidence review as used by the CIT in review of Commerce's scope ruling determination. *See King Supply Co., LLC v. United States*, 674 F.3d 1343, 1348 (Fed. Cir. 2012) ("In reviewing the Trade Court's decision on the Scope Ruling,

its initial scope determination, Commerce determined that the good in question is a covered good; there are no components or parts included, whether loose or attached.[2] Accordingly, it does not fall under either the finished merchandise exclusion or the finished goods kits exclusion. *See* J.A. 340 ("Based on the information provided by Whirlpool . . . we find that the handles at issue are comprised entirely of extruded aluminum and fasteners (*i.e.* plastic end caps). Therefore, we find the handles do not meet the Department's first test for determining whether a good constitutes a finished good or finished goods kit, as established in the Geodesic Domes Scope Ruling.").

Commerce explained in its initial scope ruling that the difference between "finished goods" and "finished goods kits" is that the former is assembled upon entry while the latter is unassembled upon entry. J.A. 342–43. Commerce found unconvincing the "notion that an unassembled product in kit-form that consists solely of extrud-

---

'we step into the shoes of the [Trade Court] and apply the same deferential "substantial evidence" standard of review that it applied to its review of Commerce's determination.' We must therefore uphold Commerce's determination unless the Scope Ruling is unsupported by substantial evidence on the record, or otherwise not in accordance with law." (quoting *Walgreen Co. v. United States*, 620 F.3d 1350, 1354 (Fed. Cir. 2010)) (internal citations omitted)).

[2] The Orders define "finished merchandise" as merchandise containing aluminum extrusions as *parts* that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass or vinyl, picture frames with glass plane and backing material, and solar panels. *Antidumping Duty Order*, 76 Fed. Reg. at 30,651.

ed aluminum, save for fasteners, would, per the analysis from the Geodesic Domes Scope Ruling, fall inside the scope while the identical product entering the United States as an assembled good, would fall outside the scope of the *Orders*." J.A. 343. Commerce determined that if a product that only consists of aluminum extrusions and fasteners, as in this case, satisfies the finished merchandise exclusion, the exclusion would swallow the scope "because any aluminum extrusion products, as long as it can be identified by end use, could be considered a finished product." *Id*. Commerce reasoned that this cannot be the correct interpretation because it is contrary to the scope itself, which covers aluminum extrusions. *Id*. Commerce preserved these factual conclusions when it filed under protest its remand determination pursuant to the CIT's remand. *See* J.A. 22.

I defer to Commerce on interpreting its own antidumping duty orders and would affirm Commerce's August 2014 Scope Ruling on the basis that it is not unreasonable and is otherwise supported by substantial evidence. *See King Supply,* 674 F.3d at 1348 ("Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders. This deference is appropriate because the meaning and scope of antidumping orders are issues particularly within the expertise and special competence of Commerce." (internal citations and quotations omitted)). Therefore, I respectfully concur-in-part and dissent-in-part from the majority opinion.