# United States Court of Appeals
# for the Federal Circuit

———————————

**MERIDIAN PRODUCTS, LLC,**
*Plaintiff-Appellee*

**WHIRLPOOL CORPORATION,**
*Plaintiff*

**v.**

**UNITED STATES,**
*Defendant*

**ALUMINUM EXTRUSIONS FAIR TRADE
COMMITTEE,**
*Defendant-Appellant*

———————————

2016-2657

———————————

Appeal from the United States Court of International Trade in No. 1:13-cv-00246-TCS, Chief Judge Timothy C. Stanceu.

———————————

Decided: May 22, 2018

———————————

FRANCES PIERSON HADFIELD, Crowell & Moring, LLP, New York, NY, argued for plaintiff-appellee. Also represented by ALEXANDER SCHAEFER, Washington, DC.

ROBERT E. DEFRANCESCO, III, Wiley Rein, LLP, Washington, DC, argued for defendant-appellant. Also represented by ALAN H. PRICE, TESSA V. CAPELOTO, DERICK HOLT.

---

Before NEWMAN, O'MALLEY, and REYNA, *Circuit Judges*.

REYNA, *Circuit Judge*.

Aluminum Extrusions Fair Trade Committee appeals the decision of the United States Court of International Trade affirming a remand determination of the United States Department of Commerce. Commerce originally determined that imports of certain extruded aluminum door handles for kitchen appliances that are packaged for importation with two plastic end caps and two screws are within the scope of relevant antidumping and countervailing duty orders. On appeal, the Court of International Trade concluded that Commerce's original scope ruling was unreasonable and unsupported by substantial evidence and remanded to Commerce for reconsideration. On remand, Commerce determined, under protest, that the subject products are not included in the scope of the relevant orders. The Court of International Trade affirmed Commerce's redetermination. We *reverse* and *remand*.

## BACKGROUND

### I. Antidumping and Countervailing Duty Orders

On March 31, 2010, the Aluminum Extrusions Fair Trade Committee ("AEFTC") and the United Steel, Paper, and Forestry, Rubber, Manufacturing, Energy Allied Industrial and Service Workers International Union filed petitions with Commerce requesting initiation of antidumping and countervailing duty investigations on imports of certain aluminum extrusions from the People's

Republic of China. On April 27, 2010, Commerce initiated antidumping and countervailing duty investigations based on those petitions. On May 26, 2011, Commerce issued antidumping and countervailing duty orders on aluminum extrusions from China. *See Aluminum Extrusions from the People's Republic of China* ("*Antidumping Duty Order*"), 76 Fed. Reg. 30,650 (Dep't of Commerce May 26, 2011); *Aluminum Extrusions from the People's Republic of China* ("*Countervailing Duty Order*"), 76 Fed. Reg. 30,653 (Dep't of Commerce May 26, 2011).[1] The antidumping duty order describes the scope of the duty order as covering imports from China of aluminum extrusions that are shapes and forms, produced by an extrusion process, made from specified aluminum alloys. *Antidumping Duty Order*, 76 Fed. Reg. at 30,650. The extrusions possess "a wide variety of shapes and forms" in "a variety of finishes." *Id.* The following is a relevant excerpt of the scope language:

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation, including, but not limited to, window frames, door frames, solar panels, curtain walls, or furniture. Such parts that otherwise meet the definition of aluminum extrusions are included in the scope. The scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially

---

[1] The antidumping and countervailing duty orders recite the same scope. *Compare Antidumping Duty Order*, 76 Fed. Reg. at 30,650–51, *with Countervailing Duty Order*, 76 Fed. Reg. at 30,653–54. For ease of reference, only the scope of the *Antidumping Duty Order* is cited.

> assembled merchandise unless imported as part of the finished goods 'kit' defined further below. The scope does not include the non-aluminum extrusion components of subassemblies or subject kits.

*Id.* at 30,650–51. The scope also contains several exclusions:

> The scope also excludes finished merchandise containing aluminum extrusions as parts that are fully and permanently assembled and completed at the time of entry, such as finished windows with glass, doors with glass or vinyl, picture frames with glass pane and backing material, and solar panels. The scope also excludes finished goods containing aluminum extrusions that are entered unassembled in a "finished goods kit." A finished goods kit is understood to mean a packaged combination of parts that contains, at the time of importation, all of the necessary parts to fully assemble a final finished good and requires no further finishing or fabrication, such as cutting or punching, and is assembled "as is" into a finished product. An imported product will not be considered a "finished goods kit" and therefore excluded from the scope of the [Orders] merely by including fasteners such as screws, bolts, etc. in the packaging with an aluminum extrusion product.

*Id.* at 30,651.

## II. Scope Ruling Request

The scope of an antidumping duty order may be challenged upon a request for a ruling on the scope of the order, i.e., whether particular merchandise is covered by the scope of the order. 19 C.F.R. § 351.225(c)(1). On January 11, 2013, Meridian requested that Commerce review the scope of the antidumping duty order to confirm whether three types of imported aluminum extruded

kitchen appliance door handles are within the scope of the antidumping duty order. Meridian described the three types of door handles as follows:

(1) Type A handles are for attachment to oven doors. They are made of aluminum extrusions, which are brushed and anodized. Holes are drilled in the handles.

(2) Type B handles are for attachment to oven doors. The handles are made of aluminum extrusions, plus two plastic injection molded end caps at each end. The end caps are used to fasten the handle to the door. Holes are drilled in the handles.[2]

(3) Type C handles are for attachment to freezer doors. They are made of aluminum extrusions and include an allen wrench and installation instructions. Holes are drilled in the handles.

J.A. 540.

Meridian argued that the door handles meet the "finished goods kit" exclusion and are therefore not within the scope of the order. J.A. 112, 131. Commerce initiated a formal scope inquiry on February 25, 2013, and solicited additional information from interested parties.

### III. Procedural History

On June 21, 2013, Commerce issued its final scope ruling based on its consideration of submissions by the parties, the "description of the products in the Scope

---

[2]    In addition to the end caps that "are used to fasten the handle to the door," imports of the Type B handles included two screws. The same is true with respect to the Type A and C handles.

Request, the scope language, and the Department's previous scope rulings concerning the Orders." J.A. 550. Commerce found that all of Meridian's handles are covered by the scope of the antidumping duty order. J.A. 550–53.

With respect to the Type B handles, the only handle subject to this appeal, Commerce determined that Meridian's products, with the exception of the fasteners, consist entirely of aluminum extrusions covered by the scope of the antidumping duty order. Commerce found that the Type B handles were not "finished goods kits" because the "scope of the Orders indicates that the inclusion of fasteners in the packaging will not transform an aluminum extrusion product into a finished goods kit." J.A. 550. In addition, Commerce found that the "scope expressly includes aluminum extrusions which are identified by reference to their end use." *Id.* Commerce concluded that Meridian's Type B handles were identified by their end use (handles for kitchen oven doors), and that they otherwise met the general scope definitions. Based on these findings, Commerce determined that the Type B handles were within the scope of the Orders. Commerce concluded that the 19 C.F.R. § 351.225(k)(1) factors, specifically the "scope of the Orders and prior scope rulings" were dispositive, and that it was unnecessary to consider the 19 C.F.R. § 351.225(k)(2) factors. J.A. 550.

## A. *Meridian I*

Meridian appealed Commerce's final scope ruling to the United States Court of International Trade ("CIT"). The CIT affirmed Commerce's scope ruling that Type A and Type C door handles consisting of a single extruded handle (and fasteners etc.) are within the scope of the orders. *Meridian Prods., LLC v. United States*, 125 F. Supp. 3d 1306, 1310–12 (Ct. Int'l Trade 2015) ("*Meridian I*"). Meridian does not challenge or appeal before the court the Type A and Type C rulings.

The CIT, however, determined the Type B handles are "assemblies" not within the scope because the extruded aluminum handles are packaged with two plastic injection molded end caps, and two screws. The CIT explained that the plastic end caps are not fasteners but "specialized parts, molded to a shape necessary to their function as components of a complete handle assembly, in which they are fitted to the ends of the extruded aluminum component." *Id.* at 1314. Based on these conclusions, the CIT held that the Type B handles are not within the general scope of the antidumping duty order.

The CIT further concluded that even if the Type B handles are within the scope, they would be excluded under the "finished merchandise" exclusion because the Type B handles are ready for use "as is" at the time of importation. *Id.* at 1315–16. Because the CIT identified record evidence that the Type B handles were assembled at the time of entry, it faulted Commerce for "not analyz[ing] the Type B handles separately with respect to the finished merchandise exclusion," but rather "address[ing] all three handle types simultaneously." *Id.*

The CIT remanded to Commerce instructing Commerce to provide clarification on its scope ruling in view of the CIT's decision that "Type B handles are not included within the general scope of the antidumping duty order." *Id.* at 1312–16.

## B. *Meridian II*

On remand, Commerce affirmed that its original scope ruling was correct. In its Final Result of Redetermination, Commerce determined that "the Type B door handles are covered by the general scope language and are not excluded under either the 'finished merchandise' or 'finished goods kit' exclusions." J.A. 34 (Commerce's Remand Redetermination dated March 23, 2016). Commerce specifically found that both the scope language and record evidence supported its finding that the plastic end

caps of the Type B handles should be treated as fasteners. J.A. 31.   But, given the CIT's remand order, Commerce determined, under protest, that the Type B door handles are not included in the scope of the order.   J.A. 29–30, 36.[3]

The CIT affirmed Commerce's remand determination, finding that substantial record evidence supports Commerce's finding that the Type B handles are not covered by the scope of the order. *Meridian Prods., LLC v. United States*, 180 F. Supp. 3d 1283, 1292 (Ct. Int'l Trade 2016) ("*Meridian II*").   The AEFTC timely appealed.   We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

STANDARD OF REVIEW

This court reviews *de novo* CIT decisions concerning antidumping and countervailing duties. *Atlantic Sugar, Ltd. v. United States*, 744 F.2d 1556, 1559 n.10 (Fed. Cir. 1984).   When reviewing antidumping duty scope rulings, we apply the same substantial evidence standard of review as does the CIT. *See Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015).   Accordingly, we will uphold a scope determination if it is supported by substantial evidence and is otherwise in accordance with law.   19 U.S.C. § 1516a(b)(1)(B)(i).   Substantial evidence is relevant evidence that a reasonable mind may accept as adequate

---

[3]   In general, Commerce will reach a remand determination under protest under circumstances where the CIT remands with instructions that dictate a certain outcome that is contrary to how Commerce would otherwise find. *See Viraj Grp., Ltd. v. United States*, 343 F.3d 1371, 1376 (Fed. Cir. 2003) (holding that Commerce preserves its right to appeal in instances where Commerce makes a determination under protest and the CIT sustains its decision after remand).

to support a conclusion. *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001).

We afford significant deference to Commerce's own interpretation of its orders, mindful that scope determinations are "highly fact-intensive and case-specific." *King Supply Co. v. United States*, 674 F.3d 1343, 1345, 1348 (Fed. Cir. 2012); *see also Meridian Prods. LLC v. United States*, 851 F.3d 1375, 1381–82 (Fed. Cir. 2017).

DISCUSSION

I

Under United States trade law, Commerce is authorized to impose antidumping duties on imports that have been deemed as sold in the United States at less than fair value, and countervailing duties on imports that benefit from certain government subsidies in their country of manufacture. *See* 19 U.S.C. §§ 1673, 1671. At the conclusion of an antidumping or countervailing duty investigation, assuming the requisite affirmative findings are made, Commerce issues orders imposing antidumping or countervailing duties on imports of the goods that were investigated in the respective underlying investigations. A description of the goods that are subject to antidumping or countervailing duties is provided in the duty order. When questions arise as to whether a particular product is included within the scope of an antidumping or countervailing duty order, an interested party may request that Commerce issue a "scope ruling" to clarify the scope with respect to the particular product. *See* 19 C.F.R. § 351.255(a); *see Shenyang*, 776 F.3d at 1354 ("There is no specific statutory provision governing the interpretation of the scope of antidumping or countervailing [duty] orders."). This case involves such a scope ruling request made by Meridian.

This Court recently clarified the legal framework required of Commerce in making scope ruling determina-

tions.  *See Meridian*, 851 F.3d at 1381–82.   First, the plain language of an antidumping order is "paramount" in determining whether particular products are included within its scope.  *King Supply*, 674 F.3d at 1345.  "If the scope is unambiguous, it governs."  *Meridian*, 851 F.3d at 1381.   In reviewing the plain language of a duty order, Commerce must consider "[t]he descriptions of the merchandise contained in the petition, the initial investigation, and the determinations of the Secretary (including prior scope determinations) and the Commission."   19 C.F.R. § 351.225(k)(1).

Second, if the above sources do not dispositively answer the question, Commerce may consider the following so-called (k)(2) factors:

(i)     The physical characteristics of the product;

(ii)    The expectations of the ultimate purchasers;

(iii)   The ultimate use of the product;

(iv)    The channels of trade in which the product is sold; and

(v)     The manner in which the product is advertised and displayed.

19 C.F.R. § 351.225(k)(2).  As the question in this appeal is dispositively resolved under the criteria in 19 C.F.R. § 351.225(k)(1), we do not reach the (k)(2) factors.

## II

AEFTC argues that Commerce's original scope ruling is supported by substantial evidence, and that the CIT failed to give deference to Commerce's interpretation and fact finding.  AEFTC contends that the CIT impermissibly substituted its judgment for that of Commerce to conclude that the plastic end caps render the handles "assemblies"

and thereby exclude the Type B handles from the general scope language.  We agree.

There is no dispute that the Type B handles alone consist of extruded aluminum products that meet the physical descriptions of merchandise subject to the order.  In addition, the parties do not dispute Commerce's ruling that the Type A and C handles are within the scope, despite that imports of those handles also include screws.  The relevant difference between the three types of handles is that Type B handles include two plastic end caps while the other handles do not.  Stated differently, but for the end caps, the Type B handle would also be covered by the scope of the order.  This appeal, therefore, turns on whether the plastic end caps remove the Type B handles from the general scope and, if not, whether the Type B handles fall within one or more of the scope exclusions.

## A. Commerce's Original Scope Ruling

Applying our legal framework, we first turn to the plain language of the antidumping duty order.  *Meridian,* 851 F.3d at 1383.  The general scope language describes the subject merchandise covered by the order as "aluminum extrusions which are shapes and forms, produced by an extrusion process, made from aluminum alloys." *Antidumping Duty Order*, 76 Fed. Reg. at 30,650.  The scope also states in relevant part:

> Subject aluminum extrusions may be described at the time of importation as parts for final finished products that are assembled after importation . . . The scope includes the aluminum extrusion components that are attached (e.g., by welding or fasteners) to form subassemblies, i.e., partially assembled merchandise unless imported as part of the finished goods 'kit' . . . Subject extrusions may be identified with reference to their end use . . . Such goods are subject merchandise if they otherwise meet the scope definition . . .

*Id.* at 30,650–51.

Commerce concluded that the Type B handles are within the scope of the plain language of the duty order because they are aluminum extrusions made of 6000 series aluminum alloy, which match the physical description of the subject merchandise. J.A. 550. That is, the handles are "aluminum extrusions which are shapes and forms," made of an aluminum alloy that is covered by the general scope of the antidumping duty order.

Commerce further found that the plastic end caps on the Type B handle did not change this characterization, because the end caps are fasteners. Although a description of fasteners only appears in the "finished goods kit" scope exclusion, the "finished goods kit" language informs what may constitute a fastener in the context of the scope of the antidumping duty order as a whole. The "finished goods kit" language states that "[a]n imported product will not be considered a 'finished goods kit' and therefore, excluded from the scope of the investigation merely by including fasteners *such as* screws, bolts, *etc.* in the packaging with an aluminum extrusion product." *Antidumping Duty Order*, 76 Fed. Reg. at 30,651 (emphasis added).

Commerce determined that both the scope language and the record evidence support a finding that the plastic end caps in question are fasteners. Commerce, therefore, concluded that "Meridian's products consist entirely of aluminum extrusions, with the exception of fasteners, which, by the language of the scope, do not remove the aluminum extrusion product from the scope." J.A. 551.

Meridian does not fully dispute that the end caps are fasteners. Meridian also describes the plastic end caps as fasteners in its scope request: "the end caps are attached at each end of the handle to serve as . . . the mechanism for attaching to the oven door." J.A. 111. Commerce found from Meridian's description for the Type B handles

that "[t]he end caps are used to *fasten* the handle to the door." J.A. 540 (emphasis added). Hence, Meridian's own descriptions support Commerce's interpretation that the end caps are fasteners.

Upon finding that the Type B handles are covered by the general scope of the antidumping duty order, Commerce next considered whether the Type B handles meet one or more of the scope exclusions. The two scope exclusion provisions are the "finished goods kit" exclusion and the "finished merchandise" exclusion.

Commerce found that the Type B handles do not meet the "finished goods kit" because the order provides that "the inclusion of fasteners in the packaging will not transform an aluminum extrusion product into a 'finished goods kit.'" J.A. 550. Given Commerce's finding that the end caps are fasteners, the Type B handles are not excluded under the "finished goods kit" provision.

Commerce next considered whether the "finished merchandise" exclusion applied, and decided it did not.[4] Commerce concluded that the issue was not whether Meridian's products were finished merchandise, "because the record is undisputed that the aluminum extrusion parts are not fully and permanently assembled with non-aluminum extrusion parts at the time of entry." J.A. 551; *but see infra* note 8. Rather, Commerce concluded, the issue is whether Meridian's products are finished goods kits, as discussed above.

---

[4]   Finished merchandise is defined as containing aluminum extrusions as parts that are fully and permanently completed at the time of entry, such as finished windows. *Antidumping Duty Order*, 76 Fed. Reg. at 30,651.

In addition, Commerce noted that Meridian's products are identified by reference to their end use: door handles for kitchen appliances. J.A. 550. The scope language recites:

> Subject extrusions may be identified with reference to their end use, such as fence posts, electrical conduits, door thresholds, carpet trim, or heat sinks (that do not meet the finished heat sink exclusionary language below). Such goods are subject merchandise if they otherwise meet the scope definition, regardless of whether they are ready for use at the time of importation.

*Antidumping Duty Order*, 76 Fed. Reg. at 30,651.

Commerce explained that because the Type B handles are aluminum extrusions that are identified by reference to their end use, and the handles otherwise meet the scope definition, the handles are included with the scope regardless of whether or not they are ready for use "as is" before importation. J.A. 551. Commerce analogized the Type B handles to door thresholds and carpet trim, which are both examples of subject extrusions that are referred to by their end use. J.A. 550. Conversely, Commerce distinguished Meridian's handles from windows with glass, or picture frames with glass and backing material, which are expressly excluded as "finished merchandise." J.A. 552.

Commerce also examined prior scope rulings interpreting the same antidumping duty order and found them consistent with its interpretation in this case. Commerce looked to prior rulings that considered whether products that consist solely of aluminum extrusions and fasteners meet the exclusion for "finished merchandise" or "finished goods kit." J.A. 551–52. For example, in both the Geodes-

ic Domes Scope Ruling[5] and Refrigerator/Freezer Trim Kits Scope Ruling,[6] Commerce found that the kits that consist only of subject aluminum extrusions, *fasteners*, and *installation accessories*, did not meet the exclusion for "finished goods kits." *Id.* In the Cutting & Marking Edges Scope Ruling,[7] Commerce found the products at issue are aluminum extrusions matching the physical description of subject merchandise, and did not constitute "finished merchandise." *Id.* Commerce noted that the "kitchen appliance door handles at issue, with the exception of fasteners, consist entirely of aluminum extrusions and, thus, are similar to the products examined in the Geodesic Dome Scope Ruling, Cutting & Edging Scope Ruling and Refrigerator/Freezer Trim Kits Scope Ruling." J.A. 553.

We conclude that the scope of the antidumping duty order as a whole supports Commerce's treatment of the end caps as fasteners. The scope language does not limit fasteners to non-plastic components, but rather provides examples of common fasteners. We see no requirement that fasteners are limited to metal screws or bolts. And the record evidence supports the conclusion that the

---

[5] Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Final Scope Ruling on J.A. Hancock, Inc.'s Geodesic Structures" (July 17, 2012).

[6] Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Final Scope Ruling on Refrigerator/Freezer Trim Kits" (Dec. 18, 2012).

[7] Memorandum to Christian Marsh, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, "Final Scope Ruling on Cutting and Marking Straight Edges" (Nov. 13, 2012).

plastic end caps serve to fasten, or attach, the handles to the appliance doors.

## B. The CIT's Interpretation

The CIT improperly narrowed the scope of the antidumping duty order by finding that the Type B handles are "assemblies" that are not covered by the general scope description. The CIT's interpretation rests on its view that the plastic end caps are not fasteners, specifically "plastic end caps do not resemble a product described by the term 'fastener' as that term is commonly and commercially used." *Meridian I*, 125 F. Supp. 3d at 1316. The CIT devotes significant discussion—that it later describes as dictum—about the applicability of the scope's subassembly provision to the Type B handles. *Id.* at 1313, 1317. In the end, instead of a subassembly, the CIT found the Type B handle was excluded under the "finished merchandise" scope exclusion provision. *Id.* at 1314–16.

As explained above, Commerce relied upon the "description of the products in the Scope Request, the scope language, and the Department's previous scope rulings concerning the Orders" to determine that the Type B handles are within the scope. J.A. 550. That the CIT arrived at conclusions different from Commerce's factual findings is immaterial to the extent that Commerce's original scope ruling is reasonable and supported by substantial evidence. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1359 (Fed. Cir. 2006) ("So long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade, and this court, reviewing under the substantial evidence standard, must defer to the Commission."). Here, the CIT gave insufficient deference to Commerce's interpretation of the scope of the antidumping and countervailing duty orders. "Commerce is entitled to substantial deference with regard to its interpretations of its own antidumping duty orders. This deference is appropriate

because the meaning and scope of antidumping orders are issues particularly within the expertise and special competence of Commerce." *King Supply*, 674 F.3d at 1348 (internal citations and quotations omitted); *see Meridian*, 851 F.3d at 1382–83.

Based on the foregoing, we hold that Commerce's original scope ruling determination that the Type B handles are included within the general scope of the antidumping and countervailing duty orders on aluminum extrusions from China is reasonable and supported by substantial evidence. We also conclude that Commerce's original scope ruling that the Type B handles are not excluded from the scope of the order under the "finished goods kit" exclusion provision is reasonable and supported by substantial evidence. Because it is unclear from the record before Commerce and the statements made by Meridian's counsel in its reply brief and at oral argument before this court whether the Type B handles are fully and permanently assembled at the time of entry,[8] we remand for

---

[8]    *See, e.g.*, J.A. 130 (Meridian describes the Type B handles as "an assembly of the middle handle bar extrusion piece plus two plastic injection molded end caps at each end"); J.A. 131 (Meridian states that "the appliance door handles are a packaged combination of parts that contains, at time of importation, all the necessary components *to assemble a complete handle* . . . The package contains the components such as bottom mount fasteners and allen wrench necessary for installation by the customer." (emphasis added)); J.A. 181 ("Meridian's Type A Handles and Type B Handles are fully and permanently assembled and completed at the time of entry like finished windows with glass or solar panels."); Appellee Br. 4 ("The Type B oven handle packages are imported assembled in a form ready to be sold to and directly used by the

Commerce to clarify this point. If Commerce determines that the Type B handles are imported unassembled, then its original scope ruling controls and the inquiry ends. If Commerce determines the Type B handles are imported fully and permanently assembled, then we direct Commerce to address the question of whether the Type B handles are excluded from the scope of the antidumping and countervailing duty order as "finished merchandise."

---

consumer/end user. They are not an unassembled kit." (citations omitted)); Oral Arg. at 7:50–8:18, available at http://www.cafc.uscourts.gov/oral-argument-recordings/2016-2657/all (Q: "Did Commerce ever say that these are assembled merchandise?" Appellant: "It didn't say whether it was assembled or not. It does in fact say . . . in the petition—the request itself—from the respondents they call it assembled merchandise. It appears to be assembled from the schematic."); *id.* at 12:01–12:03 (Meridian: "It is an assembly"); *id.* at 15:29–15:34 (Meridian referring to the Type B product: "Yes, that is a finished assembly. It's a finished product."); *id.* at 18:50–19:10 (Meridian: "To the extent that the Appellant is claiming that somehow the assembly fails to satisfy the finished merchandise exception, five pieces attached together included in a package with screws and instructions for a product to attach to an oven well that would be a final product and nothing needs to be done other than attach it."); *id.* at 20:49–20:55 (Meridian: "We're dealing with a finished good. But if it was unassembled then we have the finished goods kit exclusion."); *id.* at 21:53–22:00 (Meridian: "We have an assembly that's finished—that's imported as a finished assembly—it meets the scope of the exclusion.").

CONCLUSION

For the reasons stated above, we (1) reverse the CIT's decision in *Meridian II* affirming Commerce's remand determination; (2) reverse the CIT's decision in *Meridian I* with respect to the Type B handles; (3) instruct the CIT to vacate Commerce's remand determination; and (4) order the CIT to reinstate Commerce's original scope ruling and remand for further proceedings consistent with this opinion.    Accordingly, the decision of the United States Court of International Trade is

**REVERSED AND REMANDED**

COSTS

Each party shall bear its own costs.