# United States Court of Appeals for the Federal Circuit

---

**OMG, INC.,**
*Plaintiff-Appellee*

**v.**

**UNITED STATES,**
*Defendant-Appellant*

**MID CONTINENT STEEL & WIRE, INC.,**
*Defendant-Appellee*

---

2019-2131

---

Appeal from the United States Court of International Trade in No. 1:17-cv-00036-GSK, Judge Gary S. Katzmann.

---

Decided: August 28, 2020

---

NED H. MARSHAK, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, New York, NY, argued for plaintiff-appellee. Also represented by DAVID M. MURPHY; KAVITA MOHAN, ANDREW THOMAS SCHUTZ, Washington, DC.

SOSUN BAE, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellant. Also represented by

ETHAN P. DAVIS, JEANNE DAVIDSON, PATRICIA M. MCCARTHY; NIKKI KALBING, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

ADAM H. GORDON, The Bristol Group PLLC, Washington, DC, for defendant-appellee. Also represented by PING GONG.

_____

Before PROST, *Chief Judge,* MOORE and STOLL, *Circuit Judges.*

STOLL, *Circuit Judge.*

The Government appeals a decision of the United States Court of International Trade affirming a remand determination of the United States Department of Commerce. Commerce originally determined that imports of certain masonry anchors are within the scope of relevant antidumping and countervailing duty orders. On appeal, the Court of International Trade concluded that Commerce's original scope ruling was contrary to law and the anchors were outside the scope of the orders, remanding to Commerce for reconsideration. On remand, Commerce determined under protest that the subject anchors are not within the scope of the relevant orders. The Court of International Trade affirmed Commerce's remand determination. We affirm.

## BACKGROUND

Domestic industry participants believing that "a class or kind of foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value" may petition Commerce to impose antidumping duties on importers of foreign merchandise. 19 U.S.C. §§ 1673, 1673a(b). If Commerce determines that the subject foreign merchandise is being, or is likely to be, sold in the United States at less than its fair value, and the International

Trade Commission (ITC) determines that an industry in the United States has been materially injured or is threatened with material injury, Commerce will issue an antidumping duty order. *Id.* §§ 1673, 1673e(a). The antidumping duty order "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." *Id.* § 1673e(a)(2).

Similarly, domestic industry participants believing that a government or public entity within a foreign country is providing a countervailable subsidy for a class or kind of merchandise that is imported, sold, or likely to be sold into the United States may petition Commerce to impose countervailing duties on such merchandise. *Id.* §§ 1671(a), 1671a(b). If Commerce determines that a countervailable subsidy is being provided to such merchandise and the ITC determines that an industry in the United States has been materially injured or is threatened with material injury, Commerce will issue a countervailing duty order. *Id.* §§ 1671(a), 1671e(a). Like an antidumping order, a countervailing duty order "includes a description of the subject merchandise, in such detail as [Commerce] deems necessary." *Id.* § 1671e(a)(2). After an antidumping or countervailing duty order has issued, "[a]ny interested party may apply for a ruling as to whether a particular product is within the scope of an order." 19 C.F.R. § 351.225(c)(1).

In 2014, Mid Continent Steel & Wire, Inc. filed a petition with Commerce requesting the imposition of antidumping and countervailing duties on imports of certain steel nails from India, the Republic of Korea, Malaysia, the Sultanate of Oman, Taiwan, the Republic of Turkey, and the Socialist Republic of Vietnam. In 2015, Commerce issued antidumping and countervailing duty orders based on Mid Continent's petition. *See Certain Steel Nails from the Socialist Republic of Vietnam: Countervailing Duty Order* ("*Countervailing Duty Order*"), 80 Fed. Reg. 41,006 (Dep't of Commerce July 14, 2015); *Certain Steel Nails from the Republic of Korea, Malaysia, the Sultanate of Oman,*

*Taiwan, and the Socialist Republic of Vietnam: Antidumping Duty Orders* ("*Antidumping Duty Order*"), 80 Fed. Reg. 39,994 (Dep't of Commerce July 13, 2015) (collectively, "the Orders").

As relevant here, the Orders cover:

certain steel nails having a nominal shaft length not exceeding 12 inches.  Certain steel nails include, but are not limited to, nails made from round wire and nails that are cut from flat-rolled steel. *Certain steel nails may be of one piece construction or constructed of two or more pieces.*  Certain steel nails may be produced from any type of steel, and may have any type of surface finish, head type, shank, point type and shaft diameter.  Finishes include, but are not limited to, coating in vinyl, zinc (galvanized, including but not limited to electroplating or hot dipping one or more times), phosphate, cement, and paint.  Certain steel nails may have one or more surface finishes.  Head styles include, but are not limited to, flat, projection, cupped, oval, brad, headless, double, countersunk, and sinker.  Shank styles include, but are not limited to, smooth, barbed, screw threaded, ring shank and fluted.  Screw-threaded nails subject to this proceeding are driven using direct force and not by turning the nail using a tool that engages with the head.  Point styles include, but are not limited to, diamond, needle, chisel and blunt or no point.

*Countervailing Duty Order*, 80 Fed. Reg. at 41,006 (emphasis added to disputed language) (footnote omitted); *see also Antidumping Duty Order*, 80 Fed. Reg. at 39,995 (same). The Orders set out several exclusions, but they do not expressly exclude anchors.

OMG, Inc. imports zinc masonry anchors from Vietnam.  OMG's anchors consist of two components: a zinc alloy body and a zinc-plated steel pin.  The anchors are

designed to attach termination bars to concrete or masonry walls. Installing OMG's zinc anchors requires predrilling a hole with a diameter that matches the shank diameter of the anchor and is at least half an inch deeper than the anchor embedment. J.A. 53. The anchor is then inserted into the predrilled hole and "tap[ped] lightly" with a hammer "until [the] head of [the] anchor body is set gently against the termination bar." J.A. 54. To complete installation, the hammer is used to drive the head of the steel pin flush with the head of the anchor body, thereby expanding the anchor body in the predrilled hole to fix the anchor in place. *See* J.A. 29, 54.

In 2016, OMG submitted a scope ruling request to Commerce asking that Commerce find its zinc anchors outside the scope of the Orders. Commerce determined that "OMG's anchors should not be considered a 'composite good,' but rather a single item." J.A. 504. Examining the Orders' scope language, Commerce found it "unambiguous as to whether zinc anchors can be classified as subject merchandise" and concluded that "the inclusion of the anchors is stated clearly." J.A. 502. Focusing on the steel pin, Commerce reasoned that "[t]he galvanized pin is a steel nail with a body or attachment. By this logic, OMG's zinc anchors are, in fact, a steel nail with two components, which matches the plain description of the scope covering certain steel nails of two or more components plated in zinc." *Id.* In reaching this conclusion, Commerce noted "the identical function of both steel nails and steel pins as fasteners, and [that] each is installed into position with the use of a hammer." J.A. 503. Commerce further concluded that the factors enumerated in 19 C.F.R. § 351.225(k)(1) supported its conclusion. Accordingly, Commerce issued a final scope ruling determining that OMG's anchors are within the scope of the Orders.

OMG challenged Commerce's final scope ruling before the Court of International Trade (CIT). The CIT agreed with Commerce that the Orders' scope language is

unambiguous and noted that the plain meaning of the language of the Orders therefore governed its determination as to whether OMG's anchors were within the Orders' scope. *OMG, Inc. v. United States*, 321 F. Supp. 3d 1262, 1268 (Ct. Int'l Trade 2018). Considering the plain meaning of the term "nail," the CIT consulted several dictionary definitions, which it determined "present a 'single clearly defined or stated meaning': a slim, usually pointed object used as a fastener designed for impact insertion." *Id.* at 1268–69 (citation omitted). The CIT then reasoned that OMG's anchors are unambiguously outside the scope of the Orders because they are not nails within the plain meaning of the word. *Id.* at 1269. Specifically, OMG's anchors are "not inserted by impact into the materials to be fastened." *Id.* The CIT faulted Commerce for simultaneously "mak[ing] its determination based upon the steel pin" and acknowledging in its final scope ruling that OMG's anchors are unitary articles of commerce. *Id.* The CIT noted that the parties did not dispute that "the steel pin fits within the common definition of a nail." *Id.* But that was not the relevant question—rather, because the anchors are unitary articles, "the entire product, not just a component part, must be defined as a nail to fall within the scope of the [O]rders." *Id.* Accordingly, the CIT "remand[ed] to Commerce for further consideration consistent with [its] opinion." *Id.*

On remand, Commerce found "that OMG's zinc anchors fall outside the scope of the Orders, but" issued its "remand redetermination under respectful protest." J.A. 518. The CIT affirmed Commerce's remand determination.

The Government appeals. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

## DISCUSSION

The Government argues that the CIT erred in concluding that OMG's anchors are outside the scope of the Orders. According to the Government, the plain language of the

Orders covering nails "constructed of two or more pieces" unambiguously includes OMG's anchors. We disagree.

We review decisions of the CIT de novo, applying the same standard used by the CIT in considering Commerce's determination. *Union Steel v. United States*, 713 F.3d 1101, 1106 (Fed. Cir. 2013) (citing *Dongbu Steel Co. v. United States*, 635 F.3d 1363, 1369 (Fed. Cir. 2011)). "When reviewing antidumping duty scope rulings, we apply the same substantial evidence standard of review as does the CIT." *Meridian Prods., LLC v. United States*, 890 F.3d 1272, 1277 (Fed. Cir. 2018) (citing *Shenyang Yuanda Aluminum Indus. Eng'g Co. v. United States*, 776 F.3d 1351, 1354 (Fed. Cir. 2015)). At the same time, we give "great weight" to the informed view of the CIT. *Quiedan Co. v. United States*, 927 F.3d 1328, 1330 (Fed. Cir. 2019) (quoting *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1341 (Fed. Cir. 2016)).

"[T]he first step in a scope ruling proceeding is to determine whether the governing language is in fact ambiguous." *ArcelorMittal Stainless Belgium N.V. v. United States*, 694 F.3d 82, 87 (Fed. Cir. 2012). "If it is not ambiguous, the plain meaning of the language governs." *Id.* But "[i]f the language is ambiguous, Commerce must next consider the regulatory history, as contained in the so-called '(k)(1) materials.'" *Mid Continent Nail Corp. v. United States*, 725 F.3d 1295, 1302 (Fed. Cir. 2013) (first citing 19 C.F.R. § 351.225(k)(1); then citing *Tak Fat Trading Co. v. United States*, 396 F.3d 1378, 1382–83 (Fed. Cir. 2005); and then citing *Duferco Steel, Inc. v. United States*, 296 F.3d 1087, 1097 n.14 (Fed. Cir. 2002)). "If the (k)(1) materials are not dispositive, Commerce then considers the (k)(2) criteria . . . ." *Id.* (first citing 19 C.F.R. § 351.225(k)(2); and then citing *Walgreen Co. of Deerfield, Ill. v. United States*, 620 F.3d 1350, 1352 (Fed. Cir. 2010)).

Thus, we first address whether the scope language "nails . . . constructed of two or more pieces" is ambiguous.

Although the parties reach different conclusions regarding the ultimate issue of whether this language includes OMG's anchors, they both contend that this language is not ambiguous. The CIT agreed, holding that "'nail' is an unambiguous term." *OMG*, 321 F. Supp. 3d at 1269. "[T]he question of whether the unambiguous terms of a scope control the inquiry, or whether some ambiguity exists, is a question of law that we review de novo." *Meridian Prods. LLC v. United States*, 851 F.3d 1375, 1382 (Fed. Cir. 2017) (citing *Allegheny Bradford Corp. v. United States*, 342 F. Supp. 2d 1172, 1183 (Ct. Int'l Trade 2004)).

Here, we agree with Commerce, the CIT, and the parties that the term "nails . . . constructed of two or more pieces" is unambiguous. We appreciate that the language of the Orders may not unambiguously define the universe of "nails . . . constructed of two or more pieces" in every context. For instance, considering injury to domestic industry, the ITC identified several examples of nails "produced from two or more pieces." J.A. 339. Seemingly straightforward examples include "a nail with a decorative head, such as an upholstery nail" and "a nail with a large thin attached head"—products in which two parts together form a nail. *Id.* Less clear-cut because it includes a nail and some additional item is the ITC's example of "a nail with a rubber or neoprene washer assembled over its shaft (to seal the nail-hole in metal or fiberglass roofing, or siding)." *Id.* But we need not determine at this time whether the ITC appropriately concluded that all of these examples are, in fact, nails constructed of two or more pieces, because we consider ambiguity in the context of the merchandise at issue in this case. *See* 19 C.F.R. § 351.225(a) ("'[S]cope rulings' . . . clarify the scope of an order or suspended investigation with respect to particular products."). Indeed, "the primary purpose of an antidumping order is to place foreign exporters on notice of what merchandise is subject to duties." *ArcelorMittal*, 694 F.3d at 88. Thus, for purposes

of this appeal, we consider ambiguity of the Orders' scope language in the context of anchors.

We agree with the CIT, OMG, and the Government that the scope language "nails . . . constructed of two or more pieces" is unambiguous in this context. The language requires one or more pieces that form a nail. No party appears to dispute that for purposes of the Orders, "nails" are fasteners designed for impact insertion. *See* Appellant's Br. 19–22 (taking issue with every aspect of the CIT's definition for "nail" other than its use as a fastener and its design for "impact insertion"); Appellee's Br. 34 (defining "nail" as "a slender piece of metal with a point at one end that is driven into construction materials by impact" (citations omitted)). This understanding is sufficient to allow us to address the next step in the analysis: whether OMG's anchors meet the unambiguous scope language "nails . . . constructed of two or more pieces."

"The question of whether a product meets the unambiguous scope terms presents a question of fact reviewed for substantial evidence." *Meridian Prods.*, 851 F.3d at 1382 (citing *Novosteel SA v. United States*, 284 F.3d 1261, 1269 (Fed. Cir. 2002)). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* at 1381 (quoting *Eckstrom Indus., Inc. v. United States*, 254 F.3d 1068, 1071 (Fed. Cir. 2001)). We agree with the CIT that substantial evidence does not support Commerce's original conclusion that OMG's anchors are nails constructed of two or more pieces. On the other hand, substantial evidence supports Commerce's conclusion on remand that OMG's anchors fall outside the scope of the Orders.

Though OMG's anchors are constructed of two or more pieces, they are not nails. As an initial matter, we agree with both Commerce and the CIT that OMG's anchors should be treated as unitary items. J.A. 504 ("OMG's anchors should not be considered a 'composite good,' but

rather a single item."); *OMG*, 321 F. Supp. 3d at 1269 ("OMG's zinc anchor is a unitary article of commerce."). Considering OMG's anchors as unitary items, no reasonable person could conclude that OMG's anchors are nails because unlike nails, OMG's anchors are not designed for impact insertion.    Rather, OMG's anchors require a predrilled hole at least half an inch deeper than the anchor embedment with a diameter matching the shank diameter of the anchor.  To fasten "termination bars to concrete or masonry walls, [OMG's] [z]inc [a]nchors are inserted into predrilled holes," and "then installed with a hammer, which is used to drive the steel pin, thereby expanding the zinc body in the predrilled hole."  J.A. 29.  Expansion of the zinc body against the interior of the pre-drilled hole fixes the anchor in place, thereby fastening the termination bar to the wall.  Though nails and OMG's anchors are both installed with the use of a hammer, unlike nails, OMG's anchors are not driven by impact through the materials to be fastened.

We further conclude that Commerce's original decision that OMG's anchors are unambiguously within the scope of the Orders is contrary to law and not supported by substantial evidence because Commerce failed to consider the relevant question.  Commerce based its conclusion that OMG's anchors are "nails . . . constructed of two or more pieces" on the steel pin component of OMG's anchors when it should instead have considered OMG's anchors as unitary articles of commerce.  *See, e.g.*, J.A. 502 ("The galvanized pin is a steel nail with a body or attachment.  By this logic, OMG's zinc anchors are, in fact, a steel nail with two components.").  Commerce's focus on the steel pin runs contrary to both its determination that OMG's anchors should be considered "a single item" and the Orders' plain scope language.  J.A. 504.  Indeed, the Orders cover "nails . . . constructed of two or more pieces," not fasteners of two or more pieces, one of which is a nail.  *Countervailing Duty*

*Order*, 80 Fed. Reg. at 41,006; *Antidumping Duty Order*, 80 Fed. Reg. at 39,995.

During oral argument, the Government also asserted that the Orders' scope unambiguously includes OMG's anchors because the tariff classification subheading covering OMG's anchors, Harmonized Tariff Schedule of the United States (HTSUS) Subheading 7907.00.60.00, is specifically included in the language of the Orders. *See* Oral Arg. at 3:44–5:03, http://oralarguments.cafc.uscourts.gov/default.aspx?fl=19-2131.mp3. The Orders state: "Certain steel nails subject to this order also may be classified under HTSUS subheadings 7907.00.60.00, 8206.00.00.00 or other HTSUS subheadings." *Countervailing Duty Order*, 80 Fed. Reg. at 41,007; *Antidumping Duty Order*, 80 Fed. Reg. at 39,995. But contrary to the Government's argument, the Orders' inclusion of "[c]ertain steel nails . . . classified under HTSUS subheading[] 7907.00.60.00" does not sweep in all products classified under subheading 7907.00.60.00, which broadly covers "Other articles of zinc: Other." The plain language of the Orders limits covered products classified under subheading 7907.00.60.00 to "certain steel nails." Indeed, it is easy to imagine zinc products that are not steel nails (such as a zinc key ring) that may nonetheless fall within subheading 7907.00.60.00. Classification of OMG's anchors under subheading 7907.00.60.00 does not make OMG's anchors nails any more than classification under subheading 7907.00.60.00 would make a key ring a nail. Accordingly, classification of OMG's anchors under subheading 7907.00.60.00 does not support the conclusion that OMG's anchors are unambiguously within the scope of the Orders.

Though it is not dispositive in view of our analysis above, we are compelled to address the Government's argument that the CIT's reliance on dictionary definitions to determine the plain meaning of the word "nail" was improper and impermissibly changed the scope of the Orders. As a threshold matter, the CIT may consult dictionary

definitions to assist in determining the plain meaning of a term in an antidumping or countervailing duty order. *See Smith Corona Corp. v. United States*, 915 F.2d 683, 686 (Fed. Cir. 1990) (explaining that "the scope of a final order" may be "clarified," but not "changed in a way contrary to its terms"); *NEC Corp. v. Dep't of Commerce*, 74 F. Supp. 2d 1302, 1307 (Ct. Int'l Trade 1999) ("In determining the common meaning of a term, courts may and do consult dictionaries, scientific authorities, and other reliable sources of information including testimony of record." (citation omitted)); *see also Meridian Prods.*, 851 F.3d at 1381 n.7 (adopting dictionary definition of "unambiguous" as the standard for determining whether the scope terms of an antidumping or countervailing duty order are unambiguous); *cf. Medline Indus., Inc. v. United States*, 62 F.3d 1407, 1409 (Fed. Cir. 1995) (explaining, in the tariff classification context, that "[t]ariff terms are construed in accordance with their common and popular meaning, and in construing such terms the court may rely upon its own understanding, dictionaries and other reliable sources." (citing *Marubeni Am. Corp. v. United States*, 35 F.3d 530 (Fed. Cir. 1994)); *Mita Copystar Am. v. United States*, 21 F.3d 1079, 1082 (Fed. Cir. 1994) ("A court may rely upon its own understanding of terms used, and may consult standard lexicographic and scientific authorities, to determine the common meaning of a tariff term." (citations omitted)). Indeed, the Government conceded as much at oral argument. *See* Oral Arg. at 41:47–42:44.

Moreover, we do not agree that the CIT in this case used dictionary definitions inconsistently with the Orders' scope language. Though some of the dictionary definitions the CIT considered are, indeed, narrower than the Orders' scope language, the CIT did not rest its conclusion on these differences. As the Government notes, the scope language is broader than the definitions the CIT considered in that the scope language includes nails with blunt or no points, nails of any shaft diameter, and nails constructed of two or

more pieces.  But the CIT did not conclude that OMG's anchors are not nails because they are blunt, have a particular shaft diameter, or include two or more pieces.  Rather, consistent with our analysis above, the CIT held that OMG's anchors are not nails because the dictionary definitions "define a nail as a fastener inserted by impact into the materials to be fastened," and "[t]he "merchandise at issue is not inserted by impact into the materials to be fastened." *OMG*, 321 F. Supp. 3d at 1269.  Accordingly, the CIT did not err in relying on dictionary definitions.

Having concluded that OMG's anchors are unambiguously outside the scope of the Orders, that Commerce's remand decision is supported by substantial evidence, and that Commerce's original decision to the contrary is not supported by substantial evidence, we need not address the Government's argument that the (k)(1) sources support Commerce's determination.  *See Meridian Prods.*, 890 F.3d at 1277 ("If the scope is unambiguous, it governs." (quoting *Meridian Prods.*, 851 F.3d at 1381)).

## CONCLUSION

We have considered the parties' remaining arguments and do not find them persuasive.  For the foregoing reasons, we affirm the decision of the CIT.

**AFFIRMED**